**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

JOE FRATANTORO, RAMASESHA ABBARAJU, RONALD GALLAGHER, ERNEST AND LYNETTE GERACI, VINAY GULATI, WILLIAM HEFFERNAN, MICHAEL HERMAN, JOEL LONGSTRETH, MICHAEL MACRI, ERIC MAGGIO, VENKAIAH PANCHUMARTHI, KEVIN PEHLMAN, JEFFREY SCOTT RESNICK, CHARLES SACHETTA, JOSEPH SANFILIPPO, WOLF SENDER, SAUL AND PHYLLIS SIEGAL, DENNIS AND MARY LOU STEED, DANIEL TETREAULT, TIMOTHY TITUS, PATRICK TOWNSEND, STUART TULCHINSKY, JITENDRA VARMA, CHRIS MARINAKOS, SIDNEY AND HELEN REISS, NICK WILLIAMS, and JOHN RIZZO,

Plaintiffs,

v.

REY E. GRABATO II; DANIEL O'BRIEN; THOMAS NICHOLAS SALZANO; ARTHUR SCUTARO;. ARTHUR RAYMOND SCUTARO, Sr., ARTHUR RAYMOND SCUTARO, Jr., OLENA BUDINSKA; IVEL TURNER; JEFF ROSENBERG; MARK KORCZAK; BYRON CARTOZIAN; and BRIAN HARRINGTON.

Defendants.

Civil Action No. 2:23-cv-00053

**FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933, EXCHANGE ACT OF 1934, and STATE SECURITIES LAWS**

JURY TRIAL DEMANDED

Plaintiffs, Joe Fratantoro, Ramasesha Abbaraju, Ronald Gallagher, Ernest and Lynette Geraci, Vinay Gulati, William Heffernan, Michael Herman, Joel Longstreth, Michael Macri, Eric Maggio, Chris Marinakos, Venkaiah Panchumarthi, Kevin Pehlman, Sidney and Helen Reiss,

Jeffrey Scott Resnick, Charles Sachetta, Joseph Sanfilippo, Wolf Sender, Saul and Phyllis Siegel, Dennis and Mary Lou Steed, Daniel Tetreault, Timothy Titus, Patrick Townsend, Stuart Tulchinsky, Jitendra Varma, Nick Williams (formerly known as Carey S. Williams), and John Rizzo (collectively "Plaintiffs") individually, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against National Realty Investment Advisors LLC ("NRIA"), Rey E. Grabato II ("Grabato"), Daniel Coley O'Brien ("O'Brien"), Thomas Nicholas Salzano ("Salzano"), Arthur Scutaro ("Scutaro"), Arthur Raymond Scutaro, Sr. ("Art Scutaro"), Arthur Raymond Scutaro, Jr. ("AJ Scutaro"),Olena Budinsak ("Budinsak"), Ivel Turner ("Turner"), Jeff Rosenberg ("Rosenberg"), Mark Korczak ("Korczak"), Byron Cartozian ("Cartozian"), and Brian Harrington ("Harrington") (collectively, "Defendants"), allege the following based upon information and belief. Plaintiffs' information and belief is based upon other things, their counsel's investigation, which includes without limitation: (a) a review of the Defendant's public documents; (b) New Jersey Bureau of Securities Summary Cease and Desist Order; (c) United States Securities Exchange Commission ("SEC") filings; (d) review and analysis of court filings in the matter of *In re National Realty Investment Advisors, LLC*, Case No. 22-14539 (Bankr. D.N.J.); (e) review and analysis of court filings in *SEC v. Nat'l Realty Investment Advisors LLC*, Case No. 2:22-cv-06066 (D.N.J. Oct. 13, 2022); (f) review and analysis of press releases regarding reports and advisories about NRIA, Grabato, O'Brien, Salzano, and Scutaro; and (g) other information readily available on the internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is an action on behalf of the Plaintiffs who purchased "membership units" in the NRIA Partners Portfolio Fund I LLC ("NRIA Fund") from at least February of 2018 to January

of 2022.[1] Plaintiffs seek to recover compensable damages caused by Defendants' violation of the federal securities laws and to pursue remedies under Sections 12(a) of the Securities Act of 1933 (the "Securities Act"), 10(b) and 15(c) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder. Plaintiffs also seek to recover compensable damages caused by Defendants' violations of New Jersey statutory and common law, including N.J.S.A. § 49:3-52(a)-(c).

2. Defendants offered and sold at least $630 million worth of membership units in the NRIA Fund to at least 1,800 investors. Defendants used NRIA and the NRIA Fund to carry out a fraudulent scheme, including making and disseminating material misrepresentations, and effectuating a Ponzi scheme to divert millions of dollars invested in the NRIA Fund for their own personal gain.

3. NRIA claimed the NRIA Fund was a billion-dollar real estate development firm focused on the development of townhomes, condominium complexes, luxury residences, and mixed-use rental developments. The NRIA Fund's model purported to take advantage of the purchasing of land or property at below-market prices, developing the land or property, and then selling it for a profit.

4. Despite promising investors a guaranteed 12% annual return with yearly distributions, Defendants misrepresented the NRIA Fund's financial condition by intentionally misappropriating investor funds to create the false appearance that the NRIA Fund was generating revenue from their successful real estate development operations. In reality, investors were paid "distributions" and "returns" that were actually funds from prior investors. Investors' funds were

[1] Plaintiffs have deleted the class action allegations and are pursuing this action on behalf of the named Plaintiffs only.

being used to pay other investors their distributions, fund the Salzano family's personal, luxurious expenses, retain companies to scrub the internet free of Defendants Salzano and Scutaro's fraudulent past, and extend undisclosed loans to entities operated by the Defendants' families.

5. Investors were never informed that their funds were not being used for the development of real estate or real estate related investments, which was the supposed purpose of the NRIA Fund.

## JURISDICTION AND VENUE

6. The claims asserted herein arise under the federal securities laws and are pursuant to Sections 12(a) of the Securities Act, 10(b) and 15(c) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder.

7. This Court has personal jurisdiction over the Defendants because the operative events and fraud originated in New Jersey. Defendants Grabato, Salzano, Scutaro, Budinska, Turner, Rosenberg, Korczak, Cartozian, and Harrington are all domiciled and reside in Secaucus, New Jersey. Defendant O'Brien resides in New York but is actively engaged in business within New Jersey throughout the relevant time period through his position as manager of the NRIA portfolio of commercial mortgage-backed securities. He also wholly owned entities which were related to NRIA, including 44 Capital Management Corp., a New Jersey corporation. Further, NRIA, which the Defendants operated in furtherance of their scheme to defraud, maintained offices in the District of New Jersey.

8. This Court has original jurisdiction over the subject matter of this action under 28 U.S.C. §1331, §27 of the Exchange Act (15 U.S.C. §78aa), and §22(a) of the Securities Act (15 U.S.C. §77v(a)) because this action arises under the laws of the United States, Exchange Act, and Securities Act.

9. Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(b)(2) as the District of New Jersey is the judicial district in which a substantial part of the events giving rise to the claim occurred, which was the nationwide offering and sale of membership units in the NRIA Fund. Venue is proper in this judicial district pursuant to §27 of the Exchange Act as the Defendants are found to conduct business within the District of New Jersey. Venue is proper in this judicial district pursuant to §22 of the Securities Act as the Defendants transacted business and offered and sold securities within the District of New Jersey.

10. In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications, and employed a nationwide advertising campaign, including radio advertisements and other internet advertisements.

## PARTIES

### A. Plaintiffs

11. Plaintiff Joe Fratantoro is an individual domiciled and residing in Mount Laurel, New Jersey. Plaintiff Fratantoro invested a total of $152,700.00 as a self-directed IRA through Madison Trust in the NRIA Fund and suffered damages as a result of the federal securities laws violations alleged herein.

12. Plaintiff Ramasesha Abbaraju is an individual domiciled and residing in Irving, Texas. Plaintiff Abbaraju invested a total of $250,000.00 in the NRIA Fund and has only received $26,000.00 in total returns.

13. Plaintiff Ronald Gallagher is an individual domiciled and residing in Florence, Massachusetts. Plaintiff Gallagher invested a total of $500,000.00 in the NRIA Fund as a source

of retirement income, has not received any distributions or dividends back, and suffered damages as a result of the federal securities laws violations alleged herein.

14. Plaintiffs Ernest and Lynette Geraci are individuals domiciled and residing in East Moriches, New York. The Geraci Plaintiffs invested a total of $550,000.00 in the NRIA Fund and suffered damages as a result of the federal securities laws violations alleged herein.

15. Plaintiff Vinay Gulati is an individual domiciled and residing in Burtonsville, Maryland. Plaintiff Gulati invested a total of $337,985.98 in the NRIA Fund through "The Gulati Trust Dated July 28, 1988". To date, Plaintiff Gulati has received no dividends and has suffered damages as a result of the federal securities laws violations alleged herein.

16. Plaintiff William Heffernan is an individual domiciled and residing in Park City, Utah. Plaintiff Heffernan invested a total of $150,000.00 in the NRIA Fund, has only received $11,250.00 in dividends, and suffered damages as a result of the federal securities laws violations alleged herein.

17. Plaintiff Michael Herman is an individual domiciled and residing in Huntington, New York. Plaintiff Herman invested a total of $200,000.00 in the NRIA Fund, has only received $10,545.70 in dividends, and suffered damages as a result of the federal securities laws violations alleged herein.

18. Plaintiff Joel Longstreth is an individual domiciled and residing in Austin, Texas. Plaintiff Longstreth invested a total of $800,000.00, has only received a return on capital, and suffered damages as a result of the federal securities laws violations alleged herein.

19. Plaintiff Michael Macri is an individual domiciled and residing in Indianapolis, Indiana. Plaintiff Macri invested a total of $275,000.00, has only received $20,625.03 in dividends, and suffered damages as a result of the federal securities laws violations alleged herein. Plaintiff

Macri relied on representations made by Defendant Mark Korczak in deciding to invest in the NRIA Fund.

20. Plaintiff Eric Maggio is an individual domiciled and residing in Vienna, Virginia. Plaintiff Maggio invested a total of $91,234.00 in the NRIA Fund, has only received $10,076.00 in dividends, and suffered damages as a result of the federal securities laws violations alleged herein.

21. Plaintiff Chris Marinakos is an individual domiciled and residing in Scottsdale, Arizona. Plaintiff Marinakos invested a total of $800,000.00 in the NRIA Fund and suffered damages as a result of the federal securities laws violations alleged herein. Plaintiff Marinakos has only received a total of $127,500.00 in total dividends.

22. Plaintiff Venkaiah Panchumarthi is an individual domiciled and residing in Dublin, Ohio. Plaintiff Panchumarthi invested a total of $100,000.00 in the NRIA Fund and suffered damages as a result of the federal securities laws violations alleged herein. Plaintiff Panchumarthi was guaranteed an 18% return, and was informed that in the rare case "financial issues" arise, he would at least receive his $100,000.00 principal plus 12% interest. At no time during Plaintiff Panchumarthi's investment in the NRIA Fund did he ever see returns exceeding 10% interest.

23. Plaintiff Kevin Pehlman is an individual domiciled and residing in Houston, Texas. Plaintiff Pehlman invested a total of $150,000.00 in the NRIA Fund, has only received $17,441.90 in dividends, and suffered damages as a result of the federal securities laws violations alleged herein. Defendant Ivel Turner promised Plaintiff Pehlman dividend payments of $15,000.00 a year for five (5) years, a return of principal, and an additional $150,000.00.

24. Plaintiffs Sidney and Helen Reiss are individuals who are domiciled and reside in Deerfield Beach, Florida. The Reiss Plaintiffs invested a total of $250,000.00 worth of their

savings and income in the NRIA Fund and suffered damages as a result of the federal securities laws violations alleged herein. The Reiss Plaintiffs relied on the expertise and misrepresentations of Defendant and NRIA salesperson, Jeff Rosenberg when deciding to invest. The Reiss Plaintiffs are retired seniors who rely on their investment's monthly payments to support their daughter, son in-law, and grandchildren.

25. Plaintiff Jeffrey Scott Resnick is an individual domiciled and residing in Greenwich, Connecticut. Plaintiff Resnick invested a total of $293,857.77 in the NRIA Fund, relied on representations from Defendant Brian Harrington, and suffered damages as a result of the federal securities laws violations alleged herein. Defendant Brian Harrington informed Plaintiff Resnick that the NRIA Fund was backed by numerous projects and was a secure and safe investment.

26. Plaintiff Charles Sachetta is an individual domiciled and residing in Lynn, Massachusetts. Plaintiff Sachetta invested a total of $50,000.00 in the NRIA Fund, only received $2,750.00 in dividend payments before they ceased in May of 2022, and suffered damages as a result of the federal securities laws violations alleged herein. Plaintiff Sachetta relied on representations made by Defendant Jeffrey Rosenberg in deciding to invest in the NRIA Fund.

27. Plaintiff Joseph Sanfilippo is an individual domiciled and residing in New Hyde Park, New York. Plaintiff Sanfilippo invested a total of $100,000.00 in the NRIA Fund, was promised an 8% dividend rate for his first investment of $60,000.00, and 9% dividend rate for his second investment of $40,000.00.

28. Plaintiff Wolf Sender is an individual domiciled and residing in Pomona, New York. Plaintiff Sender invested a total of $200,000.00 in the NRIA Fund, has only received $18,333.37 in dividend payments, and suffered damages as a result of the federal securities laws

violations alleged herein. Plaintiff Sender relief on representations made by Defendant Jeff Rosenberg who promised Plaintiff Sender the NRIA Fund has a bond fund with enough money to repay investors if NRIA had a problem selling properties.

29. Plaintiffs Saul and Phyllis Siegel are individuals domiciled and residing in Suffern, New York. Collectively, the Siegel Plaintiffs invested a total of 1,250,402.00 in the NRIA Fund, did not receive any dividends, and suffered damages as a result of the federal securities laws violations alleged herein.

30. Plaintiffs Dennis and Mary Lou Steed are individuals domiciled and residing in Strongsville, Ohio. The Steed Plaintiffs invested a total of $500,000.00 in the NRIA Fund, have received $59,513.69 in distributions, are still owed $490,486.31, and have suffered damages as a result of the federal securities laws violations alleged herein.

31. Plaintiff Daniel Tetreault is an individual domiciled and residing in Charlton, Massachusetts. Plaintiff Tetreault invested a total of $100,000.00 in the NRIA Fund, only received $6,054.00 in dividends, and suffered damages as a result of the federal securities laws violations alleged herein.

32. Plaintiff Patrick Townsend is an individual domiciled and residing in Irving, Texas. Plaintiff Townsend invested a total of $50,000.00 in the NRIA Fund, did not receive any dividends, and, despite being guaranteed a minimum return of at least 12%, never received a return exceeding 6%.

33. Plaintiff Timothy Titus is an individual domiciled and residing in Ammon, Idaho. Plaintiff Titus invested $150,000.00 in the NRIA Fund, has only received $18,000.00 in distributions, and suffered damages as a result of the federal securities laws violations alleged herein. Plaintiff Titus was solicited his investment into the NRIA Fund from Defendant Ivel

Turner, who informed him that if a financial problem occurs, NRIA has more than enough cash flow from their rental income from all the units they own and manage to cover the monthly obligations of the fund.

34. Plaintiff Stuart Tulchinsky is an individual domiciled and residing in Laconia, New Hampshire. Plaintiff Tulchinsky invested a total of $300,000.00 in the NRIA Fund, only received approximately $50,000.00 in dividend payments, and suffered damages as a result of the federal securities laws violations alleged herein.

35. Plaintiff Jitendra Varma is an individual domiciled and residing in Houston, Texas. Plaintiff Varma invested a total of $150,000.00 in the NRIA Fund, have only received $17,500.00 in dividends, and suffered damages as a result of the federal securities laws violations alleged herein.

36. Plaintiff Nick Williams is an individual domiciled and residing in Boca Raton, Florida. Plaintiff Nick Williams, formerly known as Carey S. Williams, invested a total of $1,000,000.00 in the NRIA Fund and suffered damages as a result of the federal securities laws violations alleged herein.

37. Plaintiff John Rizzo is an individual domiciled and residing in Baldwin, New York. Plaintiff John Rizzo invested a total of $2,069,360.00 in the NRIA Fund and suffered damages as a result of the federal securities laws violations alleged herein. Plaintiff Rizzo relied on the expertise and misrepresentations by Defendant Brian Harrington, Senior Project Manager for NRIA.

**B. Defendants**

38. Defendant Rey E. Grabato II is an individual domiciled in, based on information and belief, Hoboken, New Jersey. Grabato was the majority owner, president, and chief executive

officer of NRIA. Grabato diverted over $4 million worth of investor funds to his own personal accounts, or those of entities he controlled.

39. Defendant Daniel Coley O'Brien is an individual domiciled in, based on information and belief, Southampton, New York. O'Brien was a part owner, Co-Chief Information Officer of NRIA, was in charge of managing NRIA's portfolio of commercial mortgage-backed securities, and was sole owner of NRIA Capital Partners, Inc. O'Brien diverted over $6 million worth of investor funds, through ownership of his controlled entities, to line his own pockets.

40. Defendant Thomas Nicholas Salzano is an individual domiciled in, based on information and belief, Secaucus, New Jersey. Salzano was a Vice President of NRIA, Portfolio Manager of NRIA, and controlled the day-to-day activities of the NRIA Fund from the Fund's inception in February 2018 until his arrest in March of 2021. Salzano carried a history contaminated with fraudulent activity, including a $50 million judgment entered against him by the Federal Trade Commission and arrest on March 4, 2021 for his role in a fraudulent scheme involving a company called NorVergence, Inc. ("NorVergence").

41. Defendant Arthur Scutaro. is an individual domiciled in, based on information and belief, Bloomfield, New Jersey. Scutaro was Vice President of the NRIA Fund and was also involved and implicated in the same fraudulent scheme with Salzano at NorVergence. It is believed that while he was defrauding NorVergence customers with Salzano, Scutaro was spelling his name as "Arthur S. Scuttaro".

42. Defendant AJ Scutaro is an individual domiciled in, based on information and belief, Manalapan, New Jersey. Defendant AJ Scutaro was Assistant Senior Vice President of the NRIA Fund and involved in fraudulent schemes with Salzano, including diverting investment funds for personal use. AJ Scutaro had direct communication with the Plaintiffs directly soliciting

investments. Upon information and belief, AJ Scutaro is the brother of Scutaro, and the son of Arthur Scutaro,

43. Defendant Aruthur Raymond Scutaro, Sr., is an individual domiciled in, based on information and belief, Broomfield, New Jeresey. Defendant Art Scutaro was employed by the NRIA and involved in fraudulent schemes with Salzano, including diverting investor funds for personal use. Defendant Art Scutaro directly solicited investments. Upon information and belief, Defendant Art Scutaro is the father or Artur Scutaro and AJ Scutaro.

44. Defendant Olena Budinska is an individual domiciled and residing in, based on information and belief, Secaucus, New Jersey. Defendant Budinska was married to Defendant Salzano and was paid more than $2 million for a no-show position she "held" with the NRIA Fund. Defendant Budinska also held the title of Treasurer of the NorVergence Foundation Inc., which was an imposter entity created by NorVergence.

45. Defendant Ivel Turner is an individual domiciled and residing in, based on information and belief, Hillside, New Jersey. Defendant Ivel Turner promoted and sold at least $1,634,704.00 worth of membership units in the NRIA Fund to Plaintiffs as an NRIA salesperson and Senior Vice President of Investor Relations. Ivel Turner is not, and has never been, registered as a broker-dealer or registered investment adviser with the SEC or FINRA. Defendant Turner was also the Vice President of Training at NorVergence—the entity used by Salzano to effectuate a separate fraudulent scheme. Lastly, Defendant Turner was the Trustee of the Summer Ave. Trust—the entity used by Defendants to complete "straw" purchases, which gave a false appearance of significant demand for the NRIA Fund's projects.

46. Defendant Jeff Rosenberg is an individual domiciled and residing in, based on information and belief, Highlands, New Jersey. Defendant Jeff Rosenberg promoted and sold at

least $500,000.00 worth of membership units in the NRIA Fund to Plaintiffs as an NRIA salesperson and Vice President of Project Management. Defendant Rosenberg is not, and has never been, registered as a broker-dealer or registered investment adviser with the SEC or FINRA.

47. Defendant Mark Korczak is an individual domiciled and residing in, based on information and belief, Whippany, New Jersey. Defendant Korczak promoted and sold at least $1,275,000.00 worth of membership units in the NRIA Fund to Plaintiffs as an NRIA salesperson and Vice President of Project Management. Defendant Korczak is not, and has not ever been, registered as a broker-dealer or registered investment adviser with the SEC or FINRA.

48. Defendant Byron Cartozian is an individual domiciled and residing in, based on information and belief, Rye Brook, New Jersey. Defendant Cartozian promoted and sold at least $150,000.00 worth of membership units in the NRIA to Plaintiffs as a salesperson and Senior Project Manager for NRIA. Defendant Cartozian is not and has never been registered as a broker-dealer or registered investment advisor with the SEC or FINRA.

49. Defendant Brian Harrington is an individual domiciled and residing in, based on information and belief, Newark, New Jersey. Defendant Cartozian promoted and sold at least $190,000.00 worth of membership units in the NRIA Fund to Plaintiffs as a salesperson and Senior Project Manager for NRIA. Defendant Cartozian is not and has never been registered as a broker-dealer or registered investment advisor with the SEC or FINRA.

## **FACTUAL BACKGROUND**

50. NRIA was formed in 2006 by Defendants Salzano and Grabato as a real estate investment company that utilized limited liability companies to allow investors the opportunity to invest in the building and renovation of real estate.

51. The NRIA Fund was organized in February of 2018 as a Limited Liability Company registered in Delaware. The NRIA Fund promised investors annual distributions of 6% with the possibility of receiving up to a total of 21% return on their investment.

52. The Defendants offered and sold membership units in the NRIA Fund through the issuance of private placement memoranda advertising the purpose of the NRIA Fund to be the development of real estate on property purchased at below-market value prices with the goal to develop and sell it for a large profit.

53. Instead of using investor funds to go towards the development of real estate on such properties, Defendants Grabato, O'Brien, Scutaro, Art Scutaro, AJ Scutaro, and Salzano diverted investor funds to pay distributions to prior investors, fund the Salzano family's luxurious lifestyle, and pay reputation management firms to clean Defendants' history tainted with previous frauds.

54. Defendants Grabato, O'Brien, Scutaro, Art Scutaro, AJ Scutaro, and Salzano used NRIA and the NRIA Fund to carry out a nationwide securities fraud and Ponzi scheme where Defendants offered and sold over $600 million worth of securities in the form of "membership units" in the NRIA Fund to approximately 2,000 investors. In addition, the NRIA Fund charged improper and excessive management and development fees to investors.

55. The Defendants were able to convince approximately 2,000 investors to invest over $600 million in the NRIA Fund. Many of these investors were retired individuals who invested in the NRIA Fund through their retirement accounts.

56. As discussed infra, multiple unacceptable business decisions lead the Defendants to begin misusing investors' funds as an attempt to bury a series of lies and misrepresentations withheld from investors during the relevant time period.

## <u>SUBSTANTIVE ALLEGATIONS</u>

57. In addition to effectuating a Ponzi scheme, which diverted millions of dollars' worth of investor funds to the Defendants, their families, and entities they controlled, the Defendants materially misled investors by formulating a series of lies and omissions designed to hoodwink investors from realizing the truth regarding Defendants, the use of their funds invested with the NRIA Fund, and purported success of the NRIA Fund and its projects.

**A. The Reality of Salzano's Past and His Role in the Management of the NRIA Fund**

58. Public offering documents for the NRIA Fund circulated to investors by the Defendants named Grabato as its President while also stating that NRIA, which was owned by Defendants Grabato and O'Brien, would manage the NRIA Fund.

59. Despite these representations, and attempts to conceal the true leadership and management of the NRIA Fund, the Defendants failed to inform investors that Salzano, who carries a fraudulent-ridden past, controlled the NRIA Fund from its inception in February of 2018 until his departure from NRIA in October 2021. PPMs described Salzano as a "Senior Independent Executive Advisor and Portfolio Manager" with the following bio:

> 25+ year background in development, construction, finance, and property management. Has been with NRIA since its inception, and instrumental in the operations and exceptional track record produced to-date. Managed over 40 large scale ground-up development projects ranging from $5M to $50M+ per site. To-date has supervised and brought to market over 1,000 finished investment property units; valued in excess of $600M. Coordinated financing for investment buyers of over $300M (debt & equity). Graduate of Rutgers University with a degree in Business and Political Science.

60. Despite his title as "Senior Independent Executive Advisor and Portfolio Manager," Salzano controlled the NRIA Fund and was the leader behind the fraudulent scheme executed through the Fund. Salzano's career as a perpetual defrauder was never disclosed to investors and was a material omission regarding who was managing the funds invested by the Plaintiffs.

61. As previously mentioned, Salzano made a career by engaging in fraudulent activity and even faced criminal and regulatory prosecution on multiple occasions prior to and during his tenure as manager of the NRIA Fund. For example, in 2005 judgment was entered against NorVergence, Inc. ("NorVergence"), a New Jersey company founded by Salzano and his brother, Peter Salzano[2], for defrauding customers.

62. Regardless of his title as a "consultant", Defendant Salzano managed NorVergence and acted as their Chief Operating Officer.

63. According to the New Jersey Securities Action entered against NRIA's key actors, which included but was not limited to, Defendant Salzano, NorVergence leased a device known as the "Matrix Box" to unsophisticated small businesses. Defendant Salzano and NorVergence falsely represented to customers that the device reduced per-minute local and long-distance bills by converting all oral communications into data.

64. Once NorVergence and Salzano secured the leases, they transferred the lease to a leasing company, received an upfront cash payment, and spent most of such cash to pay for marketing to generate more customers in order to keep the scheme alive. However, very little money remained with NorVergence and, ultimately, NorVergence was unable to continue adding enough customers to pay their suppliers and carriers, which resulted in the company filing for Chapter 11 bankruptcy that converted into a Chapter 7 liquidation of assets. This conspiracy was termed the "Matrix Scheme" as a combination of a Ponzi scheme and bust-out scheme whereby schemers, including Defendant Salzano, caused NorVergence to place orders with vendors on credit, reselling the products at a reduced price, shut down the business, and take the profits from the sales without repaying the vendors.

[2] In addition to Salzano, Defendants Scutaro and Turner were also employed by NorVergence during this time. Scutaro was the Vice President of Application Screening and Turner was the Vice President of Training at NorVergence.

65. The Federal Trade Commission ("FTC") took notice of NorVergence and Defendant Salzano's fraudulent activities and charged him with fraudulent transfers under 11 U.S.C. §§ 544(b), 548, and 550, as well as under New Jersey law. Defendant Salzano was also charged with conversion, misappropriation, unjust enrichment, breach of fiduciary duty, and fraud. Salzano settled these charges by agreeing to pay $50 million, which was suspended due to this inability to pay.

66. Next, in 2009, Salzano was indicted by a Louisiana grand jury with three counts of money laundering, conspiracy, and theft for defrauding businesses in relation to his scheme to defraud during his time at NorVergence. In 2013, Salzano pled guilty to charges of theft and was forced to pay restitution and serve three years of supervised probation in New Jersey. During this time, Salzano and NRIA began soliciting and receiving investments on behalf of NRIA.

67. Notwithstanding Salzano's history replete with fraud and criminal conduct, the Defendants never disclosed his concerning past with investors, and, in fact, using investor's funds, took considerable steps to conceal his fraudulent past.

68. For example, according to the SEC's complaint against NRIA and the Defendants (*SEC v. Nat'l Realty Investment Advisors LLC*, Case No. 2:22-cv-06066 (D.N.J. Oct. 13, 2022)), Defendant Grabato, in an attempt to conceal Salzano's role in the NorVergence fraud, paid more than $344,000.00 worth of investor funds to a technology firm in India that created "twenty-five decoy websites that would distract investors from accurate information about the NorVergence fraud if they searched terms relating to NorVergence or Thomas Salzano." Therefore, in addition to withholding material information concerning Salzano's fraudulent past, the Defendants also deceived investors by withholding material information regarding the use of their funds to assemble obstacles to investors' ability to discover NRIA leadership's fraudulent history.

69. As discussed supra, Salzano's fraudulent past was concealed so he could, again, orchestrate a fraud as a control person with NRIA. Despite his title as "Senior Independent Executive Advisor and Portfolio Manager", Salzano controlled the NRIA Fund and: (i) steered business to U.S. Construction, Inc., where his son was an owner and CFO; (ii) responded to angry investor inquiries and complaints—even drafting emails for fellow Defendants to use in response to irritated clients, and circulated a "training" email to Defendants and other NRIA employees explaining how to respond to accusations that the NRIA Fund operated as a Ponzi scheme; (iii) directed fellow Defendants to increase the guaranteed return on NRIA investments advertised to investors; (iv) influenced the removal of accurate language to be included in PPM's because he believed such language would discourage investors from investing; (v) admonished Defendants and other NRIA employees for changing the terms on agreements, and threatened them if such terms did not comply with his standards; (vi) directed NRIA to purchase office supplies from his brother, Peter Salzano, and his company, Network Digital; and (vii) instructed Defendants and NRIA employees whether or not they were authorized to enter into transactions or complete assignments related to the NRIA Fund.

70. Sheltered by the efforts taken to conceal his past and the Defendant's minimization of his role regarding the NRIA Fund, Salzano's fraudulent disposition once again emerged during his time at NRIA, and the Defendants actively concealed these facts from investors.

***Salzano Induced Investments Based on a Forged Terms Sheet***

71. On January 17, 2019, Salzano undertook to convince an NRIA investor to increase their investment in a "new opportunity" to invest in a property in North Bergen, New Jersey supposedly owned by NRIA by claiming a lender, Genesis Capital, LLC ("Genesis Capital") had agreed to provide financing for the project. He presented the investor with a Letter of Intent,

purportedly signed by the Genesis Capital CEO indicating that Genesis Capital agreed to finance the project.

72. In reality, the Genesis Capital CEO had never signed the Letter of Intent, nor agreed to provide financing for the project.

73. When Genesis learned of the forgery, they immediately sent a cease-and-desist letter addressed to Defendants Grabato and O'Brien stating that the Letter of Intent was a fraud and the supposed signature of their CEO had been forged. Genesis noted that the term sheet was created using the letterhead and text from an authentic term sheet executed with NRIA two years prior, which involved a completely different project. In response to the cease-and-desist letter sent by Genesis, Salzano attempted to characterize the forgery as a one-off mistake and sent an email to the NRIA investor, which included Defendant Scutaro, explaining that the email containing the forged Letter of Intent was a mistake and not labeled as "EXAMPLES ONLY".

74. Despite Defendants Grabato and O'Brien being placed on notice of Salzano's forgery, they took no action against him, concealed his actions from investors, and ratified his conduct by continuing to allow Salzano to exert control and authority over the administration of the NRIA Fund.

75. On March 4, 2021, Salzano was arrested for wire fraud and aggravated identity theft as a result of his attempt to induce an investor into investing in a project with a fraudulent Letter of Intent indicating the project received financing. Defendants Grabato, O'Brien, and Scutaro did not disclose Salzano's arrest to investors until March 22, 2021 and attempted to downplay his role in the administration of the NRIA Fund by describing Salzano as an "Independent Contractor" while characterizing the incident as "isolated". Grabato, O'Brien, and Scutaro claimed to place Salzano on suspension and remove him from any activities involving

NRIA, but this was false and Salzano continued to play an active role in the administration of the NRIA Fund until October of 2021.

***Salzano Attempts to Present Forged Documents to TD Bank***

76. According to the New Jersey Securities Action, Salzano continued his fraudulent acts by presenting TD Bank with forged documents seeking payment of $20 million for NRIA's project known as "Hoboken Heights". Funding for the Hoboken Heights project was supposedly being guaranteed under a nonexistent standby letter of credit by Deutsche Bank.

77. In order to secure the $20 million from TD Bank, the bank required a MT760 ("SWIFT message"), which guaranteed Deutsche Bank had set aside the $20 million to be able to fund the guarantee. On May 8, 2021, Salzano forwarded TD Bank bank identifier information but was immediately informed by a TD Bank representative that such documentation was insufficient to qualify as a SWIFT message. Subsequently, the TD Bank representative also informed Defendants Salzano and Grabato that Deutsche Bank had not actually issued Salzano a standby letter of credit.

78. Salzano proceeded to present TD Bank with two forged SWIFT messages all while pressuring TD Bank to pay the $20 million via email in June of 2019. TD Bank recognized the forgery, and on June 7, 2019, informed Salzano that they were aware the SWIFT messages were not sent by Deutsche Bank, and requested their name not be associated with the Hoboken Heights project. In a futile attempt to cover his tracks, Salzano then claimed a "hacker" was responsible for the emails and forged documents presented to TD Bank.

***Defendants Grabato, O'Brien, and Scutaro, Art Scutaro, and AJ Scutaro Knew of Salzano's Past, Actively Withheld and Concealed his Past and Present Frauds, and Continued to Permit him to Exert Authority Over the NRIA Fund.***

79. Defendants Grabato, O'Brien, Scutaro, Art Scutaro, and AJ Scutaro, were fully aware that Salzano had previously been involved in a fraud involving NorVergence, that he presented an investor with a forged Letter of Intent attempting to fraudulently induce an investment, and presented TD Bank with multiple forged SWIFT messages, yet still permitted Salzano to exert authority and control over the NRIA Fund.

80. Defendant Grabato used funds invested in the NRIA Fund (supposedly going towards real estate projects) to pay overseas reputation management firms to assist them in suppressing the truth regarding Salzano's fraudulent past. Further, despite multiple acts of fraud and crime during Salzano's tenure as head of the NRIA Fund, Defendants Grabato, O'Brien, Scutaro, Art Scutaro, and AJ Scutaro suppressed these fraudulent acts and omitted such material information in conversations with investors. Salzano's forgery was suppressed for approximately two years until his arrest in March of 2021, which initiated a misleading disclosure to investors downplaying Salzano's role and actions.

81. Even worse, Defendants Grabato, O'Brien, Scutaro, Art Scutaro and AJ Scutaro continued to allow a criminal such as Salzano, with an extensive record of fraud, to continue controlling and directing the NRIA Fund and its projects. The above-mentioned Defendants had more than enough cause, and a duty to their investors to remove Salzano from being connected with anything involving NRIA and the administration of the NRIA Fund.

**B. The Defendants' Fraud in the Offer and Sale of Membership United in the NRIA Fund**

82. As previously stated supra, the NRIA Fund was organized to acquire equity interests in LLCs to serve as the owner and manager and would invest in real estate development assets. In exchange for the NRIA Fund's services as the developer of real estate assets, NRIA was entitled to receive a share of profits and a fee of up to three percent of the purchase price of each

property they managed and developed. Investments with the NRIA Fund were in the form of "membership units", which were nationally advertised through the radio, television, internet, and New Jersey billboards as investments guaranteeing a return on investment of at least 12%. The Defendants' offer and sales of membership units in the NRIA Fund were made pursuant to Private Placement Memoranda ("PPMs") distributed nationwide to investors. This advertising campaign resulted in the sale of over $600 million worth of membership units in the NRIA Fund to approximately 2,000 investors, including to hundreds of retirees.

83. Despite Defendants' assurances that Plaintiffs' investments in the NRIA Fund would be used to fund the investments in underlying operating companies in exchange for cash flows received from the investments, Defendants Grabato, O'Brien, Salzano, Scutaro Art Scutaro, AJ Scutaro, and Turner through their positions with NRIA, made a series of material misrepresentations and omissions in the offer and sale of membership units in the NRIA Fund.

***Defendants Conducted a Ponzi Scheme to Misrepresent the NRIA Fund's Success and Made Distributions to Previous Investors***

84. PPMs distributed to investors claimed the use of the offering's proceeds would be used "for the equity investments in the Manager Investment Companies that hold and operate the properties in the Partners Fund, make investments in Real Estate-Related Investments as well as support administrative and operating expenses, working capital requirements, and other general corporate purposes." The PPMs further assured investors they would receive at least a 12% annualized return and that NRIA would cover any shortfall.

85. But these PPMs were filled with material misrepresentations, including the use of investors' funds and source of distributions being made to investors. Instead of going towards the supposed real estate development projects, the above-mentioned Defendants used investors' contributions to cover distributions being paid out to previous investors. According to the SEC's

complaint against NRIA and the Defendants (*SEC v. Nat'l Realty Investment Advisors LLC*, Case No. 2:22-cv-06066 (D.N.J. Oct. 13, 2022)), since the NRIA Fund's inception through June 14, 2021, it paid approximately $13.8 million of distributions with the majority of payments being made with investors' funds—not cash flows from real estate investments. The SEC Complaint states that "from March through June 19, 2018, the [NRIA] Fund received $904,407 in contributions from investors. During that same time period—when the [NRIA] Fund's bank account had no other deposits—$138,513 in distributions was paid out to investors."

86. The answer to the inevitable question of "where was the NRIA Fund coming up with such funds to pay out these distributions?" became quite clear—new investor deposits.

87. NRIA, in an attempt to justify its mishandling of investors' funds, did not disclose that investor funds would be used to pay distributions to other investors until a PPM randomly began making such disclosure (after investors had already been paid distributions from other investors for years).

***Defendants Grabato, O'Brien, and Salzano Disseminated Fraudulent Financial Information to Investors Regarding the NRIA Fund, its Offerings, and Current Financial Condition to Misrepresent the NRIA Fund's Success***

88. Defendants Grabato, O'Brien, and Salzano disseminated PPMs representing that the NRIA Fund would be using the "cash method" of accounting. But this was not accurate. In reality, the above-mentioned Defendants distributed financial information to investors collected from NRIA's (not the Fund) consolidated financial statements, which were prepared using the general accepted accounting principles ("GAAP").

89. Financial statements distributed to potential and current investors in the NRIA Fund were materially misleading because they did not actually depict the financial condition of the NRIA Fund, but rather of NRIA, the entity, itself. Further, despite lying about the method of

accounting used, the revenue reported to investors was, in fact, not earned and, therefore, not in compliance with GAAP—the accounting method the above-mentioned Defendants failed to disclose they were using in the first place. Nonetheless, according to the SEC's complaint against NRIA and the Defendants, even if they would have complied with GAAP, "almost none of the revenue would have been recorded."

90. The financial information communicated to investors failed to disclose the revenue that was recorded was not actually consistent with either the cash method or GAAP. Investors were misled into believing the NRIA Fund was performing much better than it really was.

91. Despite the misrepresentations resulting from the use of NRIA, i.e., the entity's financial statements, to represent the financial condition of the NRIA Fund, NRIA itself was inflating the amount of revenue "earned" by recording revenue for development fees at the time agreements were being signed by the project's operating company. According to the SEC Complaint against NRIA and Defendants, "[t]hese fees are to be paid by the end-purchasers of the property when the project is completed and sold. Thus, in accordance with GAAP, these fees cannot be recorded until the obligation is settled and the property is transferred to the buyer."

92. PPMs distributed to investors prominently claimed:

> A project management and development fee (the "Development Fee") of up to 3% of the capital stack attributable to the purchase of each property undertaken by the underlying Operating LLCs. The Development Fee is a property level fee for directing and project managing all development activities, including taking the properties from acquisition and bank financing through renovation or new building construction, as required, and continuing through to completion **and positioning for rent and/or resale,** as applicable. The Development Fee will be paid from a combination of the bank and loan funding, and equity contributions used to acquire the properties and build or develop such properties.

93. Defendants Grabato, O'Brien, and Salzano did not disclose to investors that they would cause NRIA to pocket the development fees up front instead of properly waiting for property to be transferred to the buyer and collect the fee.

94. Further, collecting and recording the development fees upfront as revenue grossly overstated NRIA's net income and created a false reality for investors concerning the NRIA Fund's financial condition.

95. Even more disturbing is the fact that Defendants Grabato, Salzano, and O'Brien were all aware revenue was being inflated and knowingly distributed such financial information to investors in PPMs prepared by Defendants Salzano and O'Brien. Such PPMs would also come with a cover letter signed by Defendant Grabato.

96. According to NRIA's independent accountant tasked with reviewing its financial statements, booking the development fees upfront was a departure from GAAP and improperly collected by NRIA. For example, according to the New Jersey Securities Action, "[i]n its opinion on NRIA's 2018 consolidated financial statements, its accountant stated that following GAAP would have decreased NRIA's revenue by $11,130,000.00. This would have meant approximately a 75% decrease in NRIA's revenue and fees…." The same accountant also concluded that if Defendants would have followed GAAP in their 2019 financial statements, "revenue and fees would have been decreased by $19 million."

97. According to the SEC complaint against NRIA and Defendants, in response to independent accountant inquiries regarding NRIA's misleading accounting practices, Defendant Salzano stated in an internal email, "[b]ottom line is if we don't reasonably and properly with disclosure book our fees the old-fashioned way [*i.e.*, when they sign agreements to purchase properties], we don't show a profit and we look very bad during this growth phase." Further, in

internal emails between Salzano, O'Brien, and Grabato, they conceded that the projects were not profitable, and they needed to record up front development fees as revenue to make the investments look profitable. In a June 2020, email with O'Brien, Salzano expressed their need to overstate revenues by stating, "we need these fees to show profit during the development phase…can't be break even or loss on financials—just looks bad—bad optics."

98. Clearly, Defendants Grabato, O'Brien, and Salzano were willing to go to great lengths to give investors the impression that the NRIA Fund was in stable financial condition and profitable—even if it meant providing them with falsified financial statements tainted with inflated revenues.

***Defendants Grabato, O'Brien, Scutaro, Salzano, and Turner Used "Straw Purchasers" to Create the False Impression of High Demand for the NRIA Fund's Properties***

99. The above-mentioned Defendants caused the NRIA Fund to enter into various fraudulent transactions by utilizing NRIA employees to purchase NRIA Fund development projects and create the false impression that such projects were experiencing high levels of demand.

100. Using an entity called "Summer Ave Trust", the above-mentioned Defendants caused related parties, including Defendant Turner, to purchase units of NRIA's Guttenberg properties, which was an NRIA Fund project. The Summer Ave Trust was created in October of 2019 by Web Marketing, a corporation run by Defendant Grabato's cousin, Nathania Lutero, as the Grantor and Defendant Ivel Turner as the Trustee.

101. According to the New Jersey Securities Action, the Summer Ave Trust property involved $800,000 which was described as being transferred to the trust to "purchase Units #209 and #407 at the Green Roof"—one of NRIA's Guttenberg properties. The beneficiary of the

Summer Ave Trust was Realty Holding Trust 3314, which is believed to have been controlled by Defendant Grabato.

102. In October of 2019, NRIA transferred over $700,00.00 to Web Marketing, who then wired the funds to the title company for the purchase of Unit #'s 209 and 407 to be completed by the Summer Ave Trust. On October 31, 2019, title for both units was conveyed to Defendant Ivel Turner, Trustee of the Summer Ave Trust and Senior Vice President for Investment Relations for NRIA.

103. The New Jersey Securities Action described the transactions as follows:

> The legal fiction of this transaction is that the seller of Unit 209 and Unit 407 was an entity controlled by [Defendant] Rey Grabato, and the beneficiary of the Summer Ave Trust that purchased the units was another entity controlled by [Defendant] Rey Grabato, Realty Holding Trust 3314.

104. Unfortunately, this was not the only example of the above-mentioned Defendants using "straw purchasers" to misrepresent and artificially inflate the demand of NRIA Fund projects with the help of Web Marketing. In total, the above-mentioned Defendants caused the NRIA Fund to loan at least $4 million of investor funds to Web Marketing for the purchase units in NRIA development projects.

105. Defendants Grabato, O'Brien, Scutaro Art Scutaro, AJ Scutaro, Salzano, and Turner neglected to inform investors their funds were being "loaned" to carry out conflict-ridden transactions for the purpose of creating the appearance that projects developed by the NRIA Fund were "selling out". Such an omission was material because projects developed by the NRIA Fund were, in fact, not selling out, and these transactions gave investors the false impression that they were investing in a project with proven success. But it was all predicated on a lie.

***Defendants Grabato, O'Brien, Scutaro Art Scutaro, AJ Scutaro, and Salzano Failed to Disclose to Investors That Their Investment was Actually Flowing to Their Personal Accounts and Defendant Salzano's Family Members, Including Defendant Olena Budinska***

106. In yet another plot to divert funds to anything but the NRIA Fund's development projects, the above-mentioned Defendants caused investor funds deposited into the Fund's main account to be diverted to other accounts controlled by the above-mentioned Defendants or their family members.

107. For example, from June 2020 through June 2021, approximately $1.25 million worth of investor funds were deposited into Defendant Grabato's LLC and personal accounts. From there, Grabato transferred $420,000 to Salzano's personal account and over $500,000 to Salzano's former and current spouses. Neither Salzano's current, nor former spouse was ever employed by NRIA or any of its affiliated entities.

108. Defendants Grabato, O'Brien, Scutaro, and Salzano paid Salzano's current wife, Defendant Budinska, millions of dollars' worth of investor funds for "no-show" jobs for positions with the NRIA Fund despite never being employed by the Fund or providing it with any services.

109. Next, approximately $6.7 million worth of investor funds was diverted to Defendant O'Brien through NRIA Capital Partners, Inc. and 44 Capital Management Corp., which are entities he owned and controlled. Defendant Scutaro was also diverted over $500,000 in investor funds in June of 2021.

110. The above-mentioned Defendants failed to disclose that investor funds would ***not*** be going towards the NRIA Fund's projects, but they would actually be diverting such funds to personally pay themselves and family members. This was a material omission considering that the PPMs distributed to investors did not mention anything that could be interpreted as placing investors on notice their investments would be going straight into the pockets of the above-mentioned Defendants and their family members. In fact, PPMs distributed to investors represented that their investment would go toward the following:

> It is intended that substantially all proceeds of this Offering will be used for investment in one or more Management Investment Companies, as well as administrative and operating expenses, working capital requirements, and other general corporate purposes, with broad discretion by the management of the Company. Pending this use, the Company may invest the proceeds of this Offering in money market accounts or other cash items, or other similar investments that the Company deems appropriate.

111. Nothing in this section of the PPM, titled **ESTIMATED USE OF PROCEEDS**, provides investors with any indication that their investment in the NRIA Fund would immediately be "loaned" to the above-mentioned Defendants and their family member' bank accounts without any obligation to repay the Fund.

***Defendants Grabato, O'Brien, Scutaro Art Scutaro, AJ Scutaro, and Salzano Omitted that up to 25% of the NRIA Funds were Invested in Speculative Commercial Mortgage-Backed Securities***

112. Defendant O'Brien was the mastermind behind the plan to divert funds invested with the NRIA Fund to ultimately invest in commercial mortgage-backed securities. The diversion strategy involved transferring investor funds to an account at Candor Financial, which was controlled by an affiliate of NRIA called NRIA Strategies.

113. The investment strategy employed by Defendant O'Brien involved purchasing commercial mortgage-backed securities ("CMBS") with ***borrowed money***, which was supposed to increase the potential reward which could be recouped from this investment. But it also increased the investment's risk.

114. According to the New Jersey Securities Action, "at the time of the strategy, NRIA's CMBS portfolio, which had a weighted average rating of BB non-investment grade, was yielding approximately 9% per annum. This alone shows the increased risk as it was triple the yield on Government agency backed investment grade CMBS. By borrowing enough funds to purchase

approximately three times the amount of CMBS than the NRIA Fund could otherwise afford without resorting to leverage, Respondents could roughly triple the yield on their equity."

115. Therefore, not only did Defendants Grabato, O'Brien, Scutaro Art Scutaro, AJScutaro, and Salzano fail to disclose to investors that they were ever investing their funds into CMBS, but they also failed to disclose that the CMBS purchased were ***speculative*** and bought with ***borrowed funds***.

116. Any indication in PPMs distributed to investors that Defendants Grabato, O'Brien, Scutaro, Art Scutaro, AJ Scutaro, and Salzano would cause the NRIA Fund to use investor funds to invest in low-grade CMBS was materially misleading and coined as a potential venture. It certainly omitted that a quarter of all investor funds would be invested in CMBS to offset the NRIA Funds' failures surrounding its real estate development projects.

117. For example, a PPM dated March 22, 2021, stated the NRIA Fund, "may invest a portion of investor funds in "Real Estate-Related Investments" such as CMBS and RMBS." Real Estate-Related Investments was defined in other PPMs as "U.S. government enterprise backed residential mortgage-backed securities ("RMBS") and commercial mortgage-backed securities ("CMBS"), which may include mortgage pools guaranteed, in whole or in part, by Federal Home Loan Mortgage Corporation and the Federal National Mortgage Association."

118. Despite using ambiguous language neither confirming nor denying whether they would invest in mortgage-backed securities, Defendants Grabato, O'Brien, Scutaro, Art Scutaro, AJ Scutaro, and Salzano also failed to disclose that the CMBS they caused the NRIA Fund to invest in were ***not*** "government enterprise backed commercial mortgage-backed securities", but actually invested in CMBS that caused their portfolio to retain a yield (9% per annum) that was three times that of Government backed CMBS.

119. In a last-ditch effort to cover up the NRIA Fund's failed real estate development projects, the above-mentioned Defendants caused the NRIA Fund to bleed their invested funds dry by investing in risky, junk CMBS. The above-mentioned Defendants cleverly concealed the misuse of investor funds by describing the NRIA Fund's potential investment in mortgage-backed securities as something it "may" do and omitted ***when*** they decided to invest in CMBS and ***who*** the investments were through.

**C. Defendants Grabato, O'Brien, Scutaro Art Scutaro, AJ Scutaro, and Salzano Caused NRIA to Employ Unlicensed Salespersons to Promote Investments in the NRIA Fund and Placed Such Salespersons in Positions of Authority**

120. In order to facilitate as many investments as possible into the NRIA Fund, Defendants Grabato, O'Brien, Scutaro, Art Scutaro, AJ Scutaro, and Salzano employed various NRIA salespersons that also held the title of "Vice President of Investor Relations".

121. These salespersons included Defendants Turner, Korczak, Rosenberg, Cartozian, and Harrington (collectively "NRIA Salespersons").

122. The NRIA Salespersons materially misrepresented the returns investors were expected to receive from their investment in the NRIA Fund by promising upwards of an 18% return, and at least a 12% investment and principal return. Specifically, Defendant Rosenberg was touting the success of the NRIA Fund and safety of the purchase of membership units by claiming that ***NRIA has a bond fund with enough money to repay the investor even if NRIA has a problem selling properties.*** This was a material misrepresentation and an utter lie considering the Fund ***did not*** have enough money to even begin to scratch the surface of paying investors back their principal.

123. Even more disturbing is the fact that ***NONE*** of the NRIA Salespersons were ever registered as a broker-dealer or registered investment adviser with the SEC or FINRA.

Nonetheless, Defendants Grabato, O'Brien, Scutaro, Art Scutaro, AJ Scutaro, and Salzano employed them as "NRIA salespersons" and Vice Presidents of Investor Relations for NRIA.

124. During the relevant period, the unlicensed NRIA Salespersons promoter and sold ***at least*** $3,749,704.00 worth of NRIA Securities to retirees and other investors.

## CAUSES OF ACTION

### COUNT I
**Violation of Section 10(b) of the Exchange Act and Rule 10b-5(a)—(c) Promulgated Thereunder Against Defendants Grabato, O'Brien, Scutaro Art Scutaro, AJ Scutaro, and Salzano**

125. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

126. Defendants Grabato, O'Brien, Scutaro Art Scutaro, AJ Scutaro, and Salzano carried out a plan, scheme and course of conduct which was intended to and did: (i) deceive investors in the NRIA Fund, including the Plaintiffs, as alleged herein; (ii) operate as a Ponzi scheme; and (iii) cause Plaintiffs substantial losses. In furtherance of this unlawful scheme, plan, and course of conduct, the above-mentioned Defendants, engaged in the actions set forth herein and are liable therefor.

127. The above-mentioned Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) omitted to state material facts necessary to make their statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the investors in the NRIA Fund in violation of Section 10(b) of the Exchange Act and Rule 10b-5(a)—(c). The above-mentioned Defendants' fraudulent scheme of operating a deceitful business included, *inter alia*, the following material omissions and misrepresentations:

1. The omission and misrepresentation concerning Defendant Salzano's past frauds and forgery;
2. The omission that the NRIA Fund was effectuating a Ponzi scheme with investor funds;
3. The omissions that Plaintiffs' funds were being misused to pay the above-mentioned Defendants' family members, sanitize Salzano's fraudulent past, and invest in low-grade, speculative CMBS investments;
4. The NRIA Fund was taking up-front development fees, thereby misrepresenting the Fund's revenue and success;
5. "Straw purchasers" were created to purchase the NRIA Fund's development projects, thereby showing a false spike in demand for the properties;
6. The omission that the NRIA Fund actually had insufficient funds to pay investors their owed distribution payments; and
7. Membership units in the NRIA Fund were being solicited and sold by unregistered individuals acting as brokers on behalf of NRIA and the NRIA Fund.

128. All of the above-mentioned Defendants are sued as primary participants in the wrongful and illegal conduct.

129. The above-mentioned Defendants, individually, and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the NRIA Fund's financial well-being.

130. The above-mentioned Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of the NRIA Fund's value, which included omitting to state material facts necessary in order to make the statements made about the NRIA Fund and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of membership units in the NRIA Fund.

131. The above-mentioned Defendants' primary liability arises from the following facts:

(i) the above-mentioned Defendants were high-level executives and/or directors at NRIA;

(ii) the above-mentioned Defendants, by virtue of their responsibilities and activities as senior officers and/or directors of the NRIA Fund, were privy to, in control of and participated in the creation, development, and dissemination of PPMs and other communications with investors containing material omissions or misrepresentations; and

(iii) each of these defendants were aware of their own dissemination of information to investors in the NRIA Fund, which they knew and/or recklessly disregarded was materially false and misleading.

132. The above-mentioned Defendants had actual knowledge of the omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material omissions were done knowingly or recklessly and for the purpose and effect

of concealing and misrepresenting the success of the NRIA Fund from the investing public. As demonstrated by Defendants' misstatements of the NRIA Fund's business, operations, leadership, and use of investor funds, Defendants, if they did not have actual knowledge of the omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

133. As a result of the failure to disclose material facts, as set forth above, demand for NRIA Fund projects were artificially inflated, investors were misled concerning the NRIA Fund's success, and investors in the NRIA Fund were shielded from the fact the Fund was managed by a criminal convicted of previous fraud crimes. In ignorance of the fact that demand of NRIA Fund properties were artificially inflated, unsuccessful, and in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by the above-mentioned Defendants, Plaintiffs purchased membership units in the NRIA Fund under false pretenses and were damaged when the NRIA Fund ceased making required interest payments.

134. At the time of said omissions, Plaintiffs were unaware of the omitted material facts and believed the statements of the above-mentioned Defendants to be true. Had Plaintiffs known the truth regarding the NRIA Fund's true financial condition, leadership, and use of their funds which were omitted by the above-mentioned Defendants, Plaintiffs would not have purchased membership units in the NRIA Fund.

135. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

136. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their respective purchases of membership units in the NRIA Fund.

**COUNT II**
**Violation of Section 12(a)(2) of The Securities Act**
**Against Defendants Grabato, O'Brien, Scutaro Art Scutaro, AJ Scutaro, and Salzano**

137. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

138. This Count is brought pursuant to §12(a)(2) of the Securities Act, 15 U.S.C. §77l(a)(2), on behalf of the Plaintiffs.

139. Defendants Grabato, O'Brien, Scutaro Art Scutaro, AJ Scutaro, and Salzano were sellers and offerors and/or solicitors of purchasers of membership units in the NRIA Fund pursuant to the NRIA Fund's Private Placement Memoranda distributed to investors and "sticker supplements" used to supplement the NRIA Fund's PPMs.

140. As set forth above, PPMs distributed to Plaintiffs contained untrue statements of material fact, omitted to state other facts necessary to make the statements made therein not misleading, and omitted to state material facts required to be stated therein. Defendants Grabato, O'Brien, Scutaro, Art Scutaro, AJ Scutaro, and Salzano's actions of solicitation included preparing the inaccurate and misleading PPMs and participating in efforts to market membership units in the NRIA Fund to investors.

141. Defendants Grabato, O'Brien, Scutaro, Art Scutaro, AJ Scutaro, and Salzano owed to the purchasers of membership units of the NRIA Fund, including Plaintiffs, the duty to make a

reasonable and diligent investigation of the statements contained in PPMs distributed to investors to ensure that such statements were accurate and did not contain any misstatement or omission of material fact. The above-mentioned Defendants, in the exercise of reasonable care, knew or should have known that the PPMs and other oral communication with investors contained misstatements and omissions of material fact.

142. Plaintiffs purchased or otherwise acquired membership units in the NRIA Fund pursuant to PPMs distributed by the above-mentioned Defendants, and the Plaintiffs did not know, or in the exercise of reasonable diligence could have known, of the untruths, inaccuracies and omissions contained in the NRIA Fund's PPMs.

143. Plaintiffs are entitled to recover the consideration paid for their membership units in the NRIA Fund, less any amount of income received thereon, upon the tender of such membership units.

## COUNT III

### Violation of Section 15(c)(1)(A) of the Exchange Act Against the NRIA Salespersons

144. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

145. As set forth above, the NRIA Salespersons directly or indirectly, by the use of the means or instrumentality of interstate commerce, of the mails, or any facility of any national securities exchange, used or employed, in connection with the purchase or sale, or the inducement or attempted inducement of the purchase or sale, of securities otherwise than on a national exchange, acts, practices, or courses of business that constitute a manipulative, deceptive, or other fraudulent device or contrivance.

146. By reason of the foregoing, the NRIA Salespersons violated, and unless enjoined will continue to violate Section 15(c)(1)(A) of the Exchange Act [15 U.S.C. § 78o(c)(1)(A)].

147. In particular, as set forth above, the NRIA Salespersons each violated Section 15(c)(1)(A) of the Exchange Act with their omissions that (i) Defendants Grabato, O'Brien, Scutaro, Art Scutaro, AJ Scutaro, and Salzano caused the NRIA Fund to misuse investor funds to effectuate a Ponzi scheme, clean Salzano's past, pay family members, and invest in low-grade CMBS; (ii) Defendant Salzano had a history replete with fraud and continued his fraudulent actions and forgery; (iii) Defendants Grabato, O'Brien, Scutaro, Art Scutaro, AJ Scutaro, and Salzano caused the NRIA Fund to misrepresent the amount of revenue received from its projects; and (iv) Defendants Grabato, O'Brien, Scutaro, Art Scutaro, AJ Scutaro, and Salzano caused "straw purchasers", including Defendant Turner, to purchase NRIA Fund projects, thereby inflating the demand for such properties. Further, as set forth above, the NRIA Salespersons each violated section 15(c)(1)(A) of the Exchange Act with their material misrepresentations that the NRIA Fund was a safe, suitable investment, and any indication that the NRIA Fund had enough money to repay investor even if NRIA has a problem selling the properties.

148. The NRIA Salespersons omitted such facts and made such misrepresentations in conversations with investors across the United States to induce or investors to purchase membership units in the NRIA Fund in exchange for large commissions. As a direct and proximate result of the wrongful conduct of the NRIA Salespersons, Plaintiffs have suffered damages in connection with their purchase of membership units in the NRIA Fund.

## COUNT IV

**Violation of the New Jersey Uniform Securities Act, N.J.S.A. §49:3-52(a)-(c)**
**Against Defendants Grabato, O'Brien, Scutaro, Art Scutaro, AJ Scutaro, and Salzano**

149. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

150. Under N.J.S.A. § 49:3-52, the New Jersey Uniform Securities Act, provides, in pertinent part, that it shall be unlawful for any person, in connection with the offer, sale, or purchase of any security, directly or indirectly:

(a) To employ any device, scheme, or artifice to defraud;

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading;

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

151. Defendants Grabato, O'Brien, Scutaro, Art Scutaro, AJ Scutaro, and Salzano are "persons" within the meaning of N.J.S.A. 49:3-49(i).

152. Defendants Grabato, O'Brien, Scutaro, Art Scutaro, AJ Scutaro, and Salzano caused the NRIA Fund to knowingly and intentionally make numerous material misstatements and omissions in connection with the sale of securities to Plaintiffs in violation of §49:3-52(b) by, among other things, misrepresenting or failing to disclose:

1. Defendant Salzano's past frauds and forgery;
2. The NRIA Fund was effectuating a Ponzi scheme with investor funds;
3. Investor funds were being misused to pay the above-mentioned Defendants' family members, clean up Salzano's fraudulent past, and invest in low-grade, speculative CMBS investments;

4. The NRIA Fund was taking up front development fees, thereby misrepresenting its revenue;
5. "Straw purchasers" were created to purchase the NRIA Fund's development projects, thereby showing a false spike in demand for the properties;
6. The NRIA Fund had insufficient funds to pay investors their owed distribution payments; and
7. Membership units in the NRIA Fund were being solicited and sold by unregistered individuals acting as brokers on behalf of NRIA and the NRIA Fund.

153. Defendants Grabato, O'Brien, Scutaro, Art Scutaro, AJ Scutaro, and Salzano made these material misrepresentations and omissions with the purpose and intent of convincing Plaintiffs to purchase membership units in the NRIA Fund.

154. Plaintiffs relied on upon the above-mentioned Defendants' material misrepresentations and omissions, and their reliance was reasonable under the circumstances.

155. Plaintiffs did not know, and in the exercise of due diligence could not have known that Defendants were making material misrepresentations and omissions.

156. Had Plaintiffs known that the above-mentioned Defendants were making material misrepresentations and omissions, they would not have invested in the NRIA Fund.

157. Defendants Grabato, O'Brien, Scutaro, Art Scutaro, AJ Scutaro, and Salzano knowingly and intentionally committed deceptive or manipulative acts in furtherance of a scheme to defraud Plaintiffs in violation of N.J.S.A. § 49:3-52(a), including the following:

1. Falsely representing the leadership of NRIA and concealing Salzano's, the true manager of the NRIA Fund, fraudulent past;

2. Causing the NRIA Fund to conduct a Ponzi scheme in an attempt to keep up with investors' distribution payments;
3. Misuse investor funds to pay the above-mentioned Defendants' family members, clean up Salzano's fraudulent past, and invest in low-grade, speculative CMBS investments;
4. Failed to inform investors their "revenue" was not an accurate representation of the NRIA Fund's finances due to the above-mentioned Defendants causing the NRIA Fund to take up front development fees;
5. Artificially inflated the demand for the NRIA Fund's development projects by creating "straw purchasers" to purchase the NRIA Fund's properties;
6. Misrepresenting the NRIA Fund's ability to pay investors their owed distribution payments; and
7. Omitted that membership units in the NRIA Fund were being sold and solicited by unregistered individuals acting as brokers on behalf of NRIA and the NRIA Fund.

158. The cited conduct by Defendants Grabato, O'Brien, Scutaro, Art Scutaro, AJ Scutaro, and Salzano also constitutes an act, practice, or course of business which operates or would operate as a fraud or deceit upon Plaintiffs in violation of N.J.S.A. § 49:3-52(c).

159. The Plaintiffs would not have invested in the NRIA Fund had they known Defendants Grabato, O'Brien, Scutaro, Art Scutaro, AJ Scutaro, and Salzano caused the NRIA Fund to make the foregoing material misstatements or omissions, including the following:

1. Defendant Salzano, the true manager of the NRIA Fund, had a history of being convicted of past fraudulent crimes;

2. The above-mentioned Defendants caused the NRIA Fund to conduct a Ponzi scheme in an attempt to keep up with investors' distribution payments;
3. The above-mentioned Defendants misused investor funds to pay the above-mentioned Defendants' family members, clean up Salzano's fraudulent past, and invest in low-grade, speculative CMBS investments;
4. Plaintiffs were not informed that the NRIA Fund's "revenue" was not an accurate representation of the NRIA Fund's finances due to the above-mentioned Defendants causing the NRIA Fund to take up front development fees;
5. Demand for the NRIA Fund's development projects was artificially inflated with the creation of "straw purchasers" to purchase the NRIA Fund's properties;
6. The NRIA Fund was actually unable to pay investors their owed distribution payments; and
7. Plaintiffs were unaware that membership units in the NRIA Fund were being sold and solicited by unregistered individuals acting as brokers on behalf of NRIA and the NRIA Fund.

160. Defendants Grabato, O'Brien, Scutaro, Art Scutaro, AJ Scutaro, and Salzano acted intentionally, with a wrongful state of mind, in violating N.J.S.A. § 49:3-52(a), (b), and (c), as demonstrated by the cited conduct. Had the above-mentioned Defendants not violated in the manner detailed herein, Plaintiffs would not have invested in the NRIA Fund or suffered damages in their failure to receive distribution payments.

161. As a direct and proximate result of the above-mentioned Defendants' wrongful conduct, Plaintiffs have suffered millions of dollars of damages.

## COUNT V

**Common Law Fraud and Negligent Misrepresentations
Against Defendants Grabato, O'Brien, Scutaro, Art Scutaro, AJ Scutaro, and Salzano.**

162. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

163. As set forth above, the above-mentioned Defendants made false representations to Plaintiffs in order to induce them to purchase membership units in the NRIA Fund through the NRIA Salespersons.

164. The above-mentioned Defendants knew at the time that these representations were made to the that they were not true.

165. The above-mentioned Defendants made these false representations to Plaintiffs with the goal of inducing reliance upon the false representations and investing in the NRIA Fund. Further, the Plaintiffs did in fact rely on the representations the above-mentioned Defendants caused the NRIA Fund to disseminate.

166. The false and fraudulent representations the above-mentioned Defendants caused the NRIA Fund to make included:

1. Defendant Salzano, was the actual true manager of the NRIA Fund, and had a history of being convicted of past fraudulent crimes;
2. The above-mentioned Defendants caused the NRIA Fund to conduct a Ponzi scheme in an attempt to keep up with investors' distribution payments;
3. The above-mentioned Defendants misused did not actually use investor funds to invest in real estate project but actually used them to pay the above-mentioned Defendants' family members, clean up Salzano's fraudulent past, and invest in low-grade, speculative CMBS investments;

4. The above-mentioned Defendants improperly labeled up front development fees as "Revenue" on the NRIA Fund's financial statements creating an inaccurate representation of the NRIA Fund's finances success;
5. Demand for the NRIA Fund's development projects was artificially inflated with the creation of "straw purchasers" to purchase the NRIA Fund's properties;
6. The NRIA Fund was actually unable to pay investors their owed distribution payments; and
7. Plaintiffs were unaware that membership units in the NRIA Fund were being sold and solicited by unregistered individuals acting as brokers on behalf of NRIA and the NRIA Fund.

167. As a proximate result of the above-mentioned Defendants' fraudulent and negligent misrepresentations, Plaintiffs have suffered substantial harm.

**<u>COUNT VI</u>**

**Unjust Enrichment Under New Jersey State Law**
**Against All Defendants**

168. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

169. As set forth above, Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of Plaintiffs.

170. When Plaintiffs invested in the NRIA Fund, through the NRIA Salespersons, they reasonably believed that the Defendants were acting in good faith in furtherance of legitimate transactions.

171. Instead, Defendants acted improperly, unjustly, and unlawfully, by taking Plaintiffs' money for their personal and family's benefit.

172. All of the Defendants have been enriched at Plaintiffs' expense through their investment into the NRIA Fund.

173. Defendants' retention of Plaintiffs' funds violates fundamental principles of justice, equity, and good conscience. Therefore, retention of that benefit without repayment would be unjust.

174. As a proximate result of Defendants' unjust retention of Plaintiffs' funds, Plaintiffs have suffered substantial harm.

**PRAYER FOR RELIEF**

Wherefore, Plaintiffs, individually, demand judgment as follows:

1. Requiring Defendants to pay compensatory damages jointly and severally in favor of the Plaintiffs for all damages sustained by reason of the acts and transactions alleged herein;

2. Awarding Plaintiffs recission, disgorgement, and all other remedies in equity or in law pursuant to the Securities Act;

3. Awarding Plaintiffs prejudgment and post-judgment interests, as well as their reasonable attorneys' fees with interest, expert fees, and other costs; and

4. Awarding such further relief as the Court deems just and proper.

DATED: March 31, 2023

Respectfully Submitted,

Gary S. Graifman
**KANTROWITZ GOLDHAMER & GRAIFMAN, P.C.**
135 Chestnut Ridge Road, Suite 200
Montvale, New Jersey 07645
(201) 391-7000
ggraifman@kgglaw.com

***Local Counsel for Plaintiffs***

William B. Federman*
FEDERMAN & SHERWOOD
10205 N. Pennsylvania Ave.
Oklahoma City, Oklahoma 73120
P: (405) 235-1560 F:(405) 239-2112
Email: wbf@federmanlaw.com

***Counsel for Plaintiffs***

* *pro hac vice application forthcoming*